UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

      Plaintiff,

   -against-           5:13-cv-1363 (LEK/DEP)

JP MORGAN CHASE BANK, ACCOUNT
NUMBER XXXXX3317, in the name of
BLAZPERU, INC., VL: $8,439.60, *et al.*,

      Defendants.

# **MEMORANDUM-DECISION and ORDER**

## **I. INTRODUCTION**

Plaintiff United States of America ("Plaintiff" or the "Government") commenced this action *in rem* to forfeit and condemn Defendant bank accounts and currency in a Verified Complaint dated November 1, 2013. Dkt. Nos. 1; 18 ("Amended Complaint"). Plaintiff alleges that Defendant bank accounts and currency constitute the proceeds of violations of 21 U.S.C. §§ 841(a) and 846; property involved in violations of 18 U.S.C. §§ 1956(a)(1)(B)(i); and property involved in violations of 31 U.S.C. § 5324. Am. Compl. ¶ 1. Presently before the Court is Claimants Latam Games, LLC ("Latam") and Crescent Marketing, Inc.'s ("Crescent") (collectively, "Claimants") Motion to dismiss Plaintiff's Amended Complaint pursuant to Supplemental Rule G(2)(f), or alternatively, Federal Rule of Civil Procedure 12(b)(6), and for lack of *in rem* jurisdiction under 28 U.S.C. § 1355(b)(1). Dkt. Nos. 42 ("Motion"); 43 ("Memorandum").

**II.    BACKGROUND**[1]

Claimants sell video games wholesale. Am Compl. ¶¶ 44, 47. Claimants were founded and are run by five brothers: Khalid Baqai ("Khalid"), Tariq M. Baqai ("Tariq"), Qasim M. Baqai ("Qasim"), Zahid Baqai ("Zahid"), and Babar M. Baqai ("Babar"). Id. ¶¶ 31, 47, 51. Crescent was founded in 1991, and is located at 8322 Artesia Boulevard, Buena Park, California, 90621. Id. ¶¶ 31, 38. The brothers also run Millennium Investment, LLC, Topz Investment, LLC, and Mini Max Group, LLC, which are all located at the same address; the property is owned by Millennium Investment, LLC. Id. ¶ 51. Latam was incorporated on July 5, 2012, and is located at 7310 NW 41st Street, Miami, Florida. Id. ¶ 36. The 7310 NW 41st Street property is owned by QNK Investments, LLC ("QNK"); Khalid and Qasim are listed members of QNK. Id. ¶¶ 36, 51. In a conversation with an Internal Revenue Service ("IRS") special agent, Tariq stated that Crescent and Latam used to be part of the same organization, but separated for business reasons. Id. ¶ 47. Claimants have sold video games to Blazperu, Inc. ("Blazperu"), which sells video games exclusively in Peru. Id. ¶ 44.

On June 27, 2013, Drug Enforcement Administration ("DEA") officers, operating in the Northern District of New York ("Northern District"), executed a search warrant of an individual based upon his/her sale of cocaine to a DEA informant. Id. ¶ 13. That individual later became a Confidential Source ("CS"). Id. At the time of his/her arrest, the CS was in possession of unprocessed heroin which had been shipped to him/her from outside of the United States. Id. ¶ 14.

---

[1] Because this matter is before the Court on a motion to dismiss, the allegations of the Amended Complaint are accepted as true and form the basis of this section. See Jaghory v. N.Y. State Dep't of Educ., 131 F.3d 326, 329 (2d Cir. 1997) (noting that, in addressing a motion to dismiss pursuant to 12(b)(6), "[a] court must accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff").

2

The CS stated that he/she was going to deliver this heroin to an individual, who later became a Confidential Informant ("CI"), for processing; the CI would then return the processed heroin to the CS, who would distribute it throughout the Northern District. Id. The CI was later arrested while waiting to meet the CS for a scheduled delivery of heroin. Id. ¶ 15.

The DEA learned from the CI that since approximately early 2012, the CI and CS, acting with others, had distributed cocaine throughout the Northern District. Id. ¶ 17. As with the heroin found on the CS and CI at the time of arrest, the cocaine was shipped from outside of the United States, concealed in various objects, to the CS; the CS then delivered the cocaine to the CI, who would extract it and return it to the CS for distribution. Id. ¶ 18. The CS returned the proceeds of the distribution to the CI. Id. The CI was then instructed by an individual (the "UI") to deposit the cash into various bank accounts. Id.

The CI identified Bank of America ("BOA") account number 1577, in the name of Blazperu, as one of the accounts into which he/she deposited cash proceeds from cocaine sales. Id. ¶ 19. The UI instructed the CI to make all cash deposits under $10,000 to avoid bank reporting requirements. Id. ¶ 20. BOA records for account number 1577 reveal a pattern of large cash deposits made on consecutive days by unknown sources; over a period from March 2012 to February 2013, approximately ninety-four cash deposits, totaling approximately $662,559.00 and all under $10,000, were made into the account. Id. ¶¶ 22-23. On June 20, 2012, BOA account number 0277 was opened in the name of Blazperu; records show a similar pattern of deposits into BOA account number 0277. Id. ¶ 23. On January 3, 2013, a BOA employee in Astoria, New York observed two individuals arriving together; one of the individuals entered and made a cash deposit into account number 0277, while the other waited outside. Id. ¶ 26. The first individual then exited the bank,

and the second individual entered and made a cash deposit into account number 1577. Id. The employee stated that this was an ongoing pattern. Id.

In March 2013, BOA closed both account number 1577 and account number 0277 due to suspicious activity. Id. ¶ 28. In February 2013, account number 3317, in the name of Blazperu, was opened at JP Morgan Chase Bank ("JP Morgan"). Id. ¶ 29. Bank records show a pattern of cash deposits under $10,000, totaling approximately $136,333.00, were made into account number 3317 from February 2013 through June 2013. Id.

From August 2012 until February 2013, approximately $227,000 was wire transferred in increments under $10,000 from Blazperu account number 1577 to BOA account number 9149, in the name of Crescent. Id. ¶ 31. Two wire transfers, one in April 2013 and one in June 2013, were also made from Blazperu account number 3317 to account number 9149. Id. ¶ 30.

BOA records also show a pattern of cash deposits under $10,000 and on consecutive days, made into BOA account number 9149. Id. ¶ 32. From July 2012 to May 2013, approximately 115 cash deposits totaling approximately $732,488.90 were made into the account. Id. From January 2010 through October 2010, a pattern of cash deposits under $10,000 totaling approximately $267,282.50, were also made into the account. Id. ¶ 40. Tariq stated in a conversation with an IRS special agent that Crescent receives no cash transactions, and that all of its account transactions are made by check, credit card, or wire transfers. Id. ¶ 48.

The records for BOA account number 9149 also show numerous deposits from legitimate sources of income such as Amazon, UPS, and American Express. Id. ¶ 38. Investigators believe, based upon review of the available bank records, that BOA account number 9149 was used to conceal and launder drug proceeds. Id. On August 19, 2013, BOA account number 9149 was

4

closed by Crescent. Id. ¶ 41.

JP Morgan account number 1606 and account number 3517 were both opened in the name of Crescent, with Khalid and Tariq as signatories. Id. ¶ 34. In July 2013, a total of $2.8 million was electronically transferred from BOA account number 9149 to JP Morgan account number 3517. Id. ¶ 33. On August 6, 2013, $2.4 million was transferred from JP Morgan account number 3517 to JP Morgan account number 1606. Id. ¶ 34.

The CI also stated that the UI instructed him/her to deposit cash proceeds from the sale of cocaine into BOA account number 5832, in the name of Latam. Id. ¶ 35. Bank records show that from August 2012 through February 2013, approximately $7.1 million was transferred from Crescent BOA account number 9149 to Latam BOA account number 5832. Id. ¶ 36.

JP Morgan account number 7583 and account number 3039 were both opened in the name of Latam, with Qasim and Zahid as signatories. Id. ¶ 37. On July 22, 2013, $1,140,000.00 was wire transferred from Latam account number 5832 to account number 7583; on July 24, 2013, $1,500,000.00 was transferred from account number 7583 to account number 3039. Id. On August 29, 2013, $85,500.00 was wire transferred from account number 5832 to account number 7583; on August 30, 2013, $100,000.00 was wire transferred from account number 7583 to account number 3039. Id.

On September 6, 2013, a seizure warrant was issued for all funds on deposit in Defendant bank accounts. Id. ¶ 42. On September 12, 2013, a search warrant was issued for the corporate offices of Latam, and on September 13, 2013, the search warrant was executed. Id. ¶¶ 53-54. During the execution of the warrant, officers spoke to Qasim, who indicated that he was aware of the bank reporting requirements, and that only "on a couple of occasions" had a Latam client made a

cash deposit into a Latam bank account. Id. ¶ 54. Subsequent to these statements, officers discovered a grey banker's bag containing approximately thirty cash deposit slips and a currency counting machine. Id. ¶¶ 54, 56. A K-9 trained in narcotics detection brought during the search also alerted to a box and bags in a locked closet. Id. ¶ 55. The box and bags contained $773,001.00 in United States currency, which was seized. Id.

Plaintiff seeks forfeiture of the following bank accounts and currency: (1) JP Morgan account number 3317, in the name of Blazperu, valued at $8,439.60; (2) JP Morgan account number 3517, in the name of Crescent, valued at $475,833.47; (3) JP Morgan account number 1606, in the name of Crescent, valued at $1,600,321.64; (4) BOA account number 5832, in the name of Latam, valued at $9,705.23; (5) JP Morgan account number 7583, in the name of Latam, valued at $915,817.33; (6) JP Morgan account number 3039, in the name of Latam, valued at $143,202.73; and (7) $773,001.00 in currency, seized on September 13, 2013, from Latam at 7310 NW 41st Street, Miami, Florida. Id. ¶¶ 2, 4.

## III. LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also FED. R. CIV. P. 12(b)(6). A court must accept as true the factual allegations contained in a complaint and draw all inferences in the plaintiff's favor. See Allaire Corp. v. Okumus, 433 F.3d 248, 249-50 (2d Cir. 2006). A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. Plausibility requires "enough fact[s] to raise a

reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Id. at 556. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

In a civil forfeiture action, however, a complaint is also subject to the pleading requirements of Rule G of the Supplemental Rules of Admiralty and Maritime Claims, which requires the facts to be stated with greater particularity. Rule G(2) requires that a complaint "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Rule G(2)(f). Thus, because in any civil forfeiture action the government must show by a preponderance of the evidence that the property is subject to forfeiture, 18 U.S.C. § 983(c)(1), Rule G(2) requires the government to plead sufficient facts to create a "reasonable belief" that it will be able to demonstrate by a preponderance of the evidence that the property is subject to forfeiture. See United States v. Mondragon, 313 F.3d 862, 865 (4th Cir. 2002). Furthermore, where the government's "theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, . . . the Government shall establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3). The "more stringent" pleading requirements of Rule G are "a way of ensuring that the government does not seize and hold, for a substantial period of time, property to which, in reality, it has no legitimate claim." United States v. Premises and Real Prop. at 4492 South Livonia Rd., Livonia, N.Y., 889 F.2d 1258, 1266 (2d Cir. 1989).

The particularity requirement, however, does not require the Court to weigh the sufficiency or admissibility of the evidence. See United States v. $15,270,885.69, No. 99 Civ. 10255, 2000 WL 1234593, at *5 (S.D.N.Y. Aug. 31, 2000). Moreover, "[n]o complaint may be dismissed on the

7

ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property." 18 U.S.C. § 983(a)(3)(D). "[T]he Government may use evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of the evidence, the property is subject to forfeiture." Id. § 983(c)(3).

## IV. DISCUSSION

The Government offers the following theories that Defendant bank accounts and currency are subject to forfeiture as: (1) the proceeds of drug offenses;[2] (2) property involved in money laundering;[3] and (3) property involved in structuring.[4] Am Compl. ¶¶ 9-11.

Claimants assert, in the first instance, that the Government's Amended Complaint suffers from basic pleading deficiencies because of its failure to relate its factual allegations to its legal theories of forfeiture. Mem. at 10-13. More specifically, Claimants argue that the Government has not alleged sufficient facts to support its drug proceeds, money laundering, or structuring theories. Id. at 15-26. Finally, Claimants argue that the Northern District does not have jurisdiction because

---

[2] 21 U.S.C. § 881(a)(6) makes forfeit "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter."

[3] 18 U.S.C. § 981(a)(1)(A) makes forfeit property involved in money laundering, including: "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property." Section 1956(a)(1)(B)(i) makes it illegal "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

[4] 31 U.S.C. § 5317(c)(2) makes forfeit property involved in structuring, including: "[a]ny property involved in a violation of section 5313, 5316, or 5324 of this title, or any conspiracy to commit any such violation, and any property traceable to any such violation or conspiracy." Section 5324(a)(3) makes it illegal to "structure or assist in structuring . . . any transaction with one or more domestic financial institutions."

the Government has not alleged sufficient facts to connect Defendant bank accounts and currency to the drug trafficking in the Northern District, and none of the structuring activities are alleged to have occurred in the Northern District.[5] Id. at 17, 27-28.

The Court finds that the Government has alleged sufficient facts to a create a reasonable belief that it will be able to meet its burden of demonstrating by a preponderance of the evidence that each of Defendant bank accounts and currency are subject to forfeiture. To the extent Claimants argue that basic pleading deficiencies require dismissal of the Government's Amended Complaint, the Court does not agree. While it is true that the Government's theories might overlap, that does not of itself require dismissal of the Government's Amended Complaint. Part of the Government's theory—and the reason it offers multiple theories of forfeiture—is that the legitimate and illegal aspects of Claimants businesses are so thoroughly integrated that "it may be impossible to definitively segregate records of illicit or illegal activities from those of the 'legitimate' business." Am. Compl. ¶ 39. Rule G does not prohibit the Government from pleading multiple theories, but only requires that the Government "state sufficiently detailed facts." See $15,270,885.69, 2000 WL 1234593, at *5. The Court finds that the Government has stated sufficiently particular facts to support each of its theories of forfeiture. The Court will first address Claimants' objections to the Government's structuring theory; it will then address Claimants' objections to the Government's drug proceeds and money laundering theories together. Finally, the Court addresses Claimants' jurisdictional arguments.

---

[5] Claimants do not challenge the Court's *in rem* jurisdiction over Blazperu JP Morgan account number 3317. Mem. at 28.

### A. Structuring

Structuring is defined as when a person "conducts or attempts to conduct one or more transactions in currency . . . for the purposes of evading reporting requirements." 31 C.F.R. § 1010.100. In order to establish a structuring offense under 31 U.S.C. § 5324, the Government must prove that the defendant: (1) engaged in acts of structuring; (2) did so knowing that the financial institutions involved were obligated to report currency transactions in excess of $10,000; and (3) acted with the intent to evade this reporting requirement. United States v. MacPherson, 424 F.3d 183, 189 (2d Cir. 2005).

The Amended Complaint alleges that 115 structured cash deposits, totaling approximately $732,488.90, were made into Crescent BOA account number 9149 from July 2012 to May 2013. Am. Compl. ¶ 32. The records show that all the deposits were under $10,000 and were often made on the same or consecutive days. Id. A similar pattern of apparently structured cash deposits was made into account number 9149 from January 2010 through October 2010. Id. ¶ 40. Account number 9149 was closed on August 19, 2013. Id. ¶ 41. Prior to being closed, money from account number 9149 was transferred into Crescent JP Morgan account number 3517 and account number 1606, and into Latam JP Morgan account numbers 5832, 7583, and 3039. Id. ¶¶ 33, 34, 36, 37. In conversations with authorities, Crescent and Latam officers stated that the companies did "no cash" transactions, or had only done cash transactions "on a couple of occasions." Id. ¶¶ 48, 54.

Claimants do not dispute that the Government has identified a series of structured deposits into account number 9149. See Mem. at 24. Rather, Claimants argue that the Government has not identified who did the alleged structuring and, therefore, has not established that such person was aware of the currency transaction reporting requirements and made the structured deposits to evade

the requirements. Id. Thus, according to Claimants the Government has not adequately pled all of the elements of a structuring offense. Claimants also argue that to the extent the Government has adequately pled structuring as to account number 9149, it has not traced the structured money to the other seized accounts. Id. at 26.

The Court does not agree with Claimants' argument that the Amended Complaint lacks sufficient facts to infer that the person who conducted the structured transactions was aware of the reporting requirements and structured the deposits of currency to evade them. "The *mens rea* elements of knowledge and intent can often be proved through circumstantial evidence." MacPherson, 424 F.3d at 189. In MacPherson, the Second Circuit found that a reasonable jury could infer from the defendant's decision to deposit a quarter-million dollars in series of small cash transactions that the defendant knew of the reporting requirements and was intent on avoiding them. Id. at 191; see also United States v. Van Allen, 524 F.3d 814, 820 (7th Cir. 2008) ("The fact that [the defendant] was willing to sacrifice efficiency and convenience . . . by going to separate banks in the same day to make almost identical deposits supports the inference that he knew of and intended to avoid the reporting requirements.").[6] Thus, the pattern of transactions described in the Amended Complaint is sufficient to support the Government's allegation that the deposits were structured.

To the extent Claimants argue that the Amended Complaint lacks allegations as to structuring activities by Claimant companies, those arguments also fail. In the first instance, in a civil forfeiture proceeding, "[t]he innocence of the owner is irrelevant—it is enough that the

---

[6] United States v. $255,427.15 in U.S. Currency, 841 F. Supp. 2d 1350 (S.D. Ga. 2012), cited by Claimants, is not to the contrary: that case was on summary judgment motions, and the court merely found that a pattern of apparent structured transactions did not require a finding of knowledge and intent, 841 F. Supp. 2d at 1358.

property was involved in a violation to which forfeiture attaches." United States v. Sandini, 816 F.2d 869, 872 (3d Cir. 1987). As discussed *supra*, the Government has pled sufficient facts to infer that the depositors were aware of the reporting requirements and structured the transactions to avoid them. See United States v. $776,670.00, Civ. No. 13-4108, 2014 WL 1669929, at *4 (D.N.J. Apr. 28, 2014). Thus, the Government has adequately pled the elements of structuring under 31 U.S.C. § 5324. If Claimants are in fact unconnected to the deposits, they will be able to appeal to the "innocent owner" defense at trial. See 18 U.S.C. § 983(d).

However, the Government's allegations also create a reasonable belief that it will be able to show that Claimant companies either knew or were willfully that the seized funds were the product of structured transactions. Claimants' officers stated to authorities that the Claimant companies did "no cash" transactions or had done so only "on a couple of occasions." Am. Compl. ¶¶ 48, 54. Yet, records show approximately $1 million in structured cash deposits into Crescent account number 9149 during a period in 2010 and a period in 2012 to 2013. Id. ¶¶ 32, 40. These allegations create an inference that the structured transactions into account number 9149 were not in the ordinary course of business and that Claimants would have been aware of them on account of their volume. Moreover, Qasim allegedly admitted to authorities that he was aware of the reporting regulations. Id. ¶ 54.

Finally, Claimants argue that the Government has not traced the structured deposits made into account number 9149 to the other accounts. On the contrary, the Government does trace the structured cash deposits through a series of large wire transfers. In July 2013, subsequent to the structured transactions, $2.8 million was transferred from account number 9149 to Crescent JP Morgan account number 3517; then, on August 6, 2013, $2.4 million was transferred from account

12

number 3517 to Crescent account number 1606.  Am. Compl. ¶¶ 33, 34.  A large amount of money—$7.1 million—was also transferred from account number 9149 to Latam BOA account number 5832 during a period—August 2012 through February 2013—that overlapped with the period when the structured deposits were made into account number 9149.  Id. ¶ 36.  Then, in July and August 2013, money was transferred from account number 5832 to Latam JP Morgan account number 7583, and from account number 7583 to Latam JP Morgan account number 3039.  Id. ¶ 37.  These alleged transfers, and their proximity in time, are sufficient to trace the structured funds from account number 9149 to the other seized accounts.

The cases Claimants cite do not dictate a different conclusion.  See Mem. at 26 (citing, *inter alia*, United States v. $2,200,000 in U.S. Currency, 2014 U.S. Dist. LEXIS 39807 (D. Md. Mar. 26, 2014)).  In $2,200,000, the court dismissed the Government's amended complaint against seized funds because there was no allegation connecting the funds in the seized account to the account where alleged drug proceeds were deposited; however, the court found that an allegation in the original complaint that the funds in the seized account had been transferred from the account into which drug proceeds were deposited would have been sufficient to justify seizure of the account.  2014 U.S. Dist. LEXIS, at *46.  The Government here has alleged that the structured funds were transferred between the seized accounts; therefore, the Government has met its obligation to trace the funds to each of the seized accounts.

### B. Drug Proceeds and Money Laundering

The Government relates a conspiracy for the shipment and distribution of cocaine and heroin in the Northern District, and the subsequent deposit of the proceeds in various bank accounts.  The Government then traces a series of large transfers—often close in time—through Defendant bank

accounts. The Government's theory under 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(A) is that proceeds from the Northern District drug trafficking have been concealed in Defendant bank accounts, among legitimate funds from Claimants' businesses. Am. Compl. ¶¶ 38-39, 52. The alleged structuring activities—which the Court has found state an independent ground to seize the Defendant bank accounts—appear to be part of the Government's theory of a conspiracy to conceal drug proceeds. See id. ¶¶ 19-22.

Claimants argue that the Government has not identified which of the seized properties are subject to forfeiture as drug proceeds or for money laundering. Mem. at 15, 17. Claimants further argue that the Government has not traced any drug proceeds into Defendant bank accounts. Id. at 15. Finally, Claimants argue that the Government has not alleged that any employee of Claimants knew that currency received by Claimants were drug proceeds, or that any transaction was designed to conceal the proceeds of unlawful activity. Id. at 15-16, 19.

Although more speculative than its structuring theory, the Government has alleged sufficient facts to support both its drug proceeds and money laundering theories to survive Claimants' Motion to dismiss. First, the Government specifically alleges that the CI deposited cash from the sale of cocaine into Latam BOA account number 5832. Am. Compl. ¶ 35. As described *supra*, money from account number 5832 was transferred to Latam JP Morgan account number 7583 and Latam JP Morgan account number 3039. Id. ¶ 37. Furthermore, a K-9 trained in narcotics detection positively alerted to Defendant currency found in Latam's offices. Id. ¶ 55. Second, the Government has gathered significant circumstantial evidence linking the seized accounts to the Northern District drug trafficking. See United States v. Daccarett, 6 F.3d 37, 56 (2d Cir. 1993) (stating that circumstantial evidence is permissible in forfeiture proceeding). The Government has

14

alleged large transfers to Defendant bank accounts from Blazperu banks accounts into which drug proceeds were deposited. See Am. Compl. ¶¶ 19-20, 22-23, 29-31. The Government has also alleged a series of large transfers between Defendant bank accounts. See id. ¶¶ 33-34, 36-37. These allegations are consistent with the Government's concealment theory. Finally, the Government has alleged a number of facts suggesting that Claimants were involved in cash transactions unrelated to business purposes: Claimants stated to authorities that they engaged in few cash transactions, yet $773,001.00 in currency, cash deposit slips, and a currency counting machine were all discovered on Latam's premises, and numerous structured cash deposits were made into Crescent account number 9149. Id. ¶¶ 32, 54-56.

All of these allegations, coupled with the Government's theory that Claimants are acting to conceal drug proceeds in legitimate business activities, Am. Compl. ¶¶ 39, 52, are sufficient to create a reasonable belief that the Government will be able meet its burden of proof at trial on its concealment of drug proceeds theory. Claimants' argument that the Government has not alleged knowledge of drug transactions on the part of Claimants' employees fails for the same reason as Claimants' similar objection to the structuring theory. The Government has alleged sufficient facts to support its theory of a conspiracy to launder drug proceeds; Claimants will be able to argue the "innocent owner" defense at trial. Moreover, for the reasons *supra*, the Government has pled sufficient facts to create a reasonable belief that it will be able to show either knowledge or willful blindness on the part of Claimant companies.

**C. Jurisdiction**

Section 1355 of Title 28 of the United States Code provides that a forfeiture action may be brought in "the district in which any of the acts or omissions giving rise to the forfeiture occurred."

15

28 U.S.C. § 1355(b)(1)(A). Claimants contend that jurisdiction is lacking in the Northern District because the Amended Complaint fails to allege facts supporting a reasonable belief that Defendant bank accounts and currency are proceeds from drug trafficking in the Northern District. Mem. at 17. Claimants also assert that the Government's structuring theory does not support jurisdiction because none of the alleged structuring activities occurred in the Northern District. Id. at 27.

However, for the reasons stated *supra*, the Court has found that the Government has stated sufficient facts to support its theory that the seized funds were used to conceal drug proceeds. Because the Northern District was the locus of the drug trafficking activities, the Court therefore has jurisdiction over the Government's *in rem* action against Defendant bank accounts and currency.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Claimants Crescent Marketing, Inc. and Latam Games, LLC's Motion (Dkt. No. 42) to dismiss is **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED: April 22, 2015
Albany, NY

Lawrence E. Kahn
U.S. District Judge